# United States Court of Appeals
### For the Eighth Circuit

_____

No. 21-1481
_____

Craig Shaw; Katie Shaw

*Plaintiffs - Appellees*

v.

Farm Bureau Property & Casualty Insurance Company

*Defendant - Appellant*

_____

Appeal from United States District Court
for the District of Minnesota

_____

Submitted: October 19, 2021
Filed: January 21, 2022

_____

Before GRUENDER, ERICKSON, and STRAS, Circuit Judges.

_____

GRUENDER, Circuit Judge.

Craig and Katie Shaw sued their insurance company seeking payment of the policy limit in full on the claim for the second of two fires that destroyed their house. The district court[1] granted summary judgment in favor of the Shaws. We affirm.

---

[1]The Honorable Nancy E. Brasel, United States District Judge for the District of Minnesota.

# I.

Two fires, occurring two months apart, destroyed the house of Craig and Katie Shaw. The first fire burned a large hole in an exterior wall, and the second fire demolished the rest of the house.

After the first fire, the Shaws' insurance company, Farm Bureau Property & Casualty Insurance Company, paid damages in the sum of $159,808.52. Before any significant repairs had been made, the second fire destroyed the house completely. The Shaws submitted a second claim, and Farm Bureau paid the Shaws $108,991.48. That amount is the difference between the policy limit of $268,800 and the amount already paid for the first fire. The fires occurred within the same policy period.

The Shaws sued Farm Bureau for breach of contract, claiming that notwithstanding Farm Bureau's payment after the first fire, the total loss entitled the Shaws to payment of the full policy limit for the second fire by the policy's terms. Both parties moved for summary judgment.

The district court granted the Shaws' motion for summary judgment and denied Farm Bureau's motion. It held that the second fire caused a total loss entitling the Shaws to the full policy limit over and above what Farm Bureau had paid on the previous claim. The court further held that Minnesota's valued-policy statute, Minn. Stat. § 65A.08, subd. 2, obligated Farm Bureau to pay the full policy limit on the second claim. Farm Bureau appeals.

# II.

We review *de novo* the district court's summary-judgment decisions, *Jerry's Enters., Inc. v. U.S. Specialty Ins.*, 845 F.3d 883, 887 (8th Cir. 2017), its interpretation of the insurance policy, *id.*, and its interpretation of state insurance law, *Brill v. Mid-Century Ins.*, 965 F.3d 656, 659 (8th Cir. 2020). Summary

judgment is appropriate only if there is no dispute of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

### III.

We begin by addressing whether the terms of the insurance policy entitle the Shaws to relief. "Because this case is in federal court based on diversity jurisdiction, Minnesota's substantive law controls our analysis of the insurance policy." *Jerry's Enters.*, 845 F.3d at 887. Minnesota law requires us to "ascertain and give effect to the intentions of the parties as reflected in the terms of the insuring contract." *Eng'g & Constr. Innovations, Inc. v. L.H. Bolduc Co.*, 825 N.W.2d 695, 704 (Minn. 2013). "Provisions in an insurance policy are to be interpreted according to both plain, ordinary sense and what a reasonable person in the position of the insured would have understood the words to mean." *Midwest Fam. Mut. Ins. v. Wolters*, 831 N.W.2d 628, 636 (Minn. 2013) (internal quotation marks omitted). Insurance policies must be construed as a whole. *Watson v. United Servs. Auto. Ass'n*, 566 N.W.2d 683, 692 (Minn. 1997). If policy language "is susceptible to two or more reasonable interpretations," then it must be "resolved in favor of the insured." *Midwest*, 831 N.W.2d at 636.

The Shaws' claim centers on the Total Loss Valuation provision of the policy, which states that "[i]n the event of a total loss of the dwelling . . . , the limit of insurance indicated in the Declarations represents the total value of the dwelling insured." This provision is "consistent with the Minnesota standard fire insurance policy," *see Auto-Owners Ins. v. Second Chance Invs., LLC*, 827 N.W.2d 766, 768 (Minn. 2013), which "requires the insurer to pay the policyholder an amount equal to the limit of insurance in case of a total loss," *id.* at 770. The parties agree that the second fire "rendered the Shaws' house a total loss." They further agree that the policy requires Farm Bureau to pay an amount equal to the policy limit if covered occurrences cause a total loss. They disagree, however, on what the policy requires when two covered occurrences successively contribute to a building's total destruction. Farm Bureau contends that in such cases, the two claims' combined

payout may not exceed the policy limit, while the Shaws argue that the full policy limit must be paid on the claim for the occurrence that delivered the finishing blow.

The disagreement turns on the meaning of the words "total loss." The Shaws understand the phrase to be result-based. Their interpretation asks whether an occurrence resulted in the complete destruction of the structure without regard to the structure's original condition. By contrast, Farm Bureau's interpretation posits that whether a "total loss" has occurred depends on the original condition of the house at the time the contract was made. To Farm Bureau, the result is not sufficient to make a total-loss determination; one must also assess whether, prior to the loss, the structure was whole.

We first consider the "plain, ordinary sense" of the phrase "total loss." *See Midwest*, 831 N.W.2d at 636. The word "total" means "whole," or "[c]omplete in extent or degree; absolute, utter." "Total," *Oxford English Dictionary* (2d ed. 1989). A "loss" is a deprivation. *See* "Loss," *Oxford English Dictionary* (2d ed. 1989) (defining "loss" as "[t]he being deprived of, or the failure to keep (a possession . . . )," "ruin, destruction," and "[t]he fact of losing (something specified or contextually implied)"). Farm Bureau asserts that a house with missing exterior wall portions is a "partial house," not a "whole house," and so its destruction cannot be a total loss. On that view, the second fire caused a partial loss, and the destruction can be understood as a total loss only by combining the two fires.

The grammar of the Total Loss Valuation provision resists Farm Bureau's interpretation. Importantly, the word "total" modifies the word "loss" rather than the insured object. The provision does not say "in the event of the loss of the total (or whole) dwelling." Instead, it reads: "in the event of a total loss." It is thus the loss—the deprivation—that must be total. Hence, one could fairly say the second fire caused a total loss because the destruction was complete, even if the house was not. In fact, the building's original condition is irrelevant to the conclusion that the second fire, unlike the first, caused an utter destruction, a total loss. This result-based approach accords with ordinary usage. For example, it would not be unusual

or inaccurate to say that a collision "totaled" one's car even if the car had already been missing a door at the time of the crash. Thus, the "plain, ordinary sense" of the phrase "total loss" favors, or at least permits, the Shaws' interpretation and supports the conclusion that the second fire, by itself, caused a total loss. *See Midwest*, 831 N.W.2d at 636. Even if Farm Bureau's interpretation is also reasonable, the ambiguity must be "resolved in favor of the insured." *Id.*

The policy, when read as a whole, further supports the Shaws' interpretation. The Policy Period provision, which states that coverages "apply to each accident, 'occurrence' and loss that takes place during the policy period," anticipates that separate claims for separate occurrences will be assessed separately. Furthermore, nowhere does the policy state that successive losses deplete the general policy limit on the house. As the drafter, Farm Bureau could have included such a limitation, *see Safeco Ins. v. Lindberg*, 380 N.W.2d 219, 222 (Minn. Ct. App. 1986) (construing policy against insurer where the policy did not "clearly identify coverage and exclusions"), *aff'd*, 394 N.W.2d 146 (Minn. 1986), as other insurance companies have done, *see, e.g.*, *Coats v. Farmers Ins. Exch.*, 230 S.W.3d 215, 218 (Tex. App. 2006) (construing policy language providing that "[e]ach time there is a loss to any building . . . the [policy limit] will be reduced by the amount of the loss," and "[a]s repairs are made, the amount of insurance will be reinstated up to the [policy limit]"). Indeed, it did so with the policy's Pollutant Cleanup and Removal Coverage section, under which Farm Bureau "will pay no more than $25,000 . . . during any policy period regardless of the number of losses." Farm Bureau's failure to attach a similar restraint to the general policy limit indicates that no such restraint exists. *Cf. Weber v. Sentry Ins.*, 442 N.W.2d 164, 167 (Minn. Ct. App. 1989). Granted, the lack of such a provision does not conclusively refute Farm Bureau's position that "total loss" should be determined with reference to the original condition of the house. Nonetheless, the provisions calling for separate and independent treatment of each occurrence, except where explicitly noted, militate against an interpretation of "total loss" that would require multiple claims to be assessed together.

The absence of a provision establishing a general duty to repair also favors the Shaws. Farm Bureau's argument implies a duty to repair as a condition to full payment of the policy limit after a total loss. By Farm Bureau's logic, had the policy not covered the first fire, the Shaws would not have been entitled to the policy limit even though the second fire—only a partial loss according to Farm Bureau—totally destroyed their house. In that scenario, though they would continue to pay the same premiums, the Shaws could not obtain the benefit of their bargain until they made full repairs. Yet the policy contains no general duty to repair. Instead, the Shaws have a responsibility "to make any repairs that are necessary to protect the property from further damage." Other repairs that would restore the house to its original condition are not required. We do not think that "a reasonable person in the position of the insured would have understood" the Total Loss Valuation provision to include an implied duty to repair. *See Midwest*, 831 N.W.2d at 636; *cf. Luis v. RBC Cap. Mkts., LLC*, 984 F.3d 575, 579 (8th Cir. 2020) (applying Minnesota law and noting that "[f]or unambiguous contract language, this court should not rewrite, modify, or limit [a contract's] effect by a strained construction"). In fact, Farm Bureau reserved its right to inspect and survey the property to determine insurability and to reduce the policy limit or cancel the policy entirely. These provisions indicate how the parties decided to handle lasting damage to the house: not through an implied duty to repair, but by an express right to decrease coverage.

Farm Bureau's reliance on the Special Causes of Loss provision, which establishes that coverage is for "accidental direct physical loss," does not help its case. Although Farm Bureau correctly observes that the second fire did not cause direct, physical damage to parts of the house that were already destroyed, explaining that "[t]here cannot be 'direct physical loss' to something that does not exist," that is immaterial if the totality of the loss is determined solely by the extent of the devastation. In other words, Farm Bureau's argument begs the question by assuming a definition of "total loss" that it has not shown to be correct.

In addition to plain meaning and context, Minnesota common law supports the result-based interpretation of "total loss." The Minnesota Supreme Court has

long held that "[a] building is not a total loss . . . unless it has been so far destroyed by the fire that no substantial part or portion of it above ground remains in place capable of being safely utilized in restoring the building to the condition in which it was before the fire." *Auto-Owners*, 827 N.W.2d at 770 (quoting *Nw. Mut. Life Ins. v. Rochester German Ins.*, 88 N.W. 265, 267 (Minn. 1901)). The overall thrust of this definition is result-based, and the only reference to a structure's prior condition cuts against Farm Bureau's argument in two ways. First, the building's "condition . . . before the fire" is considered merely to assess the feasibility of restoration, not to determine whether the building was intact. *See id.* Second, the definition refers to the building's condition immediately prior to the loss, not its condition at the beginning of the policy period. In sum, Minnesota courts assess total loss by evaluating the extent of a building's destruction (1) regardless of whether the structure was whole immediately before the loss and (2) regardless of the structure's condition at the beginning of the policy period.

Because the plain language of the Total Loss Valuation provision, the context of the rest of the policy, and Minnesota's background common-law principles all support the Shaws' result-based interpretation, we conclude that the second fire alone caused a total loss.[2] The district court did not err in granting the Shaws' motion for summary judgment.

**IV.**

For the foregoing reasons, we affirm the judgment in favor of the Shaws.

_____

---

[2]Because the policy terms, interpreted according to Minnesota principles of construction, plainly entitle the Shaws to judgment as a matter of law, we do not address whether Minnesota's valued-policy statute, Minn. Stat. § 65A.08, subd. 2, compels the same outcome.